UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PLUMBERS' PENSION FUND, LOCAL 130 U.A., PLUMBERS' WELFARE FUND, LOCAL 130 U.A., THE TRUST FUND FOR APPRENTICE AND JOURNEYMAN EDUCATION AND TRAINING, LOCAL 130, UA, and PLUMBERS RETIREMENT SAVINGS PLAN FUND, LOCAL 130, U.A., <br><br>Plaintiffs, <br>v. <br><br>P.S. COYOTE PLUMBING ENTERPRISE, INC., <br><br>Defendant. | No. 23-cv-3531 <br><br>Judge April M. Perry |

**OPINION AND ORDER**

Plaintiffs are four multi-employer plans[1] associated with the Chicago Journeymen Plumbers' Local 130, U.A. ("Local 130"). Defendant P.S. Coyote Plumbing Enterprise, Inc. is a plumbing business and employer of Local 130 workers. In August 2009, P.S. Coyote executed an agreement with Local 130 whereby it agreed to make regular contribution payments to Plaintiffs based on the hours worked for P.S. Coyote by unionized employees. P.S. Coyote also agreed to pay liquidated damages at contractually set rates whenever it made payments late.

P.S. Coyote did not make all its contribution payments on time, and in June 2023 Plaintiffs sued P.S. Coyote under the Employment Retirement Income Security Act (ERISA) and the National Labor Relations Act (NLRA) to recover damages. In their pending summary

---

[1] Plaintiffs are the Plumbers' Pension Fund, Local 130 U.A. ("Pension Fund"), the Plumbers' Welfare Fund, Local 130 U.A. ("Welfare Fund"), the Trust Fund for Apprentice and Journeyman Education and Training, Local 130 UA ("Apprentice Fund"), and Plumbers Retirement Savings Plan Fund, Local 130, U.A. ("Retirement Savings Fund").

judgment motion, Plaintiffs seek $107,729.89 in liquidated damages, based on the amount that Plaintiffs calculate P.S. Coyote owed on late contributions. For the reasons set forth below, Plaintiffs' motion is granted in part and denied in part.

## FACTS AT SUMMARY JUDGMENT

The Court draws the following facts from the parties' Local Rule 56.1 submissions and responses, the materials cited therein, and other aspects of the record in this case.

Plaintiffs are multi-employer benefit funds under ERISA. Doc. 78 ¶ 1. In August 2009, P.S. Coyote's president signed a Memorandum Agreement with Local 130, *see* Doc. 75-2 at 2, that bound P.S. Coyote to the terms of a collective bargaining agreement between Local 130 and the Plumbing Contractors Association of Chicago and Cook County, plus any amendments thereto. Doc. 78 ¶¶ 2–3. Under this collective bargaining agreement and its amendments (the "CBAs"), P.S. Coyote was required to submit monthly reports identifying the work performed by bargaining unit members for P.S. Coyote and to make contribution payments to Local 130, Plaintiffs, and other legal entities associated with Local 130. *Id*. ¶¶ 5–6. The CBAs also obligated P.S. Coyote to pay liquidated damages if its monthly contributions were late. *Id*. ¶ 10. Specifically, Section 9.8 of each CBA version contained the following identical language:

> … [A]ll contributions and deductions … are due the first (1st) day of the month following the month for which they are owed … An Employer who fails to make [required] contributions and deductions by the due date therefore, shall pay … liquidated damages in the amount of eight percent (8%) on the cumulative outstanding balance due…

Doc. 75-3 at 35, 87, 141.

Between August 2015 and June 2024, P.S. Coyote did not always make contribution payments on time. Doc. 78 ¶¶ 7, 11–81. For each month that P.S. Coyote paid late, the amount of delinquent payment was detailed in a corresponding monthly contribution report that P.S. Coyote

regularly submitted to Plaintiffs. *Id.* ¶ 7; *see also* Docs. 75-4, 75-5. Based on these contribution reports, Plaintiffs have calculated an amount P.S. Coyote purportedly owed in damages and now seek to collect that amount.

## LEGAL STANDARD

Summary judgment is appropriate when the movant shows that there is no genuine dispute of material fact such that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmovant then must come forward with specific facts showing there is a genuine issue for trial. *LaRiviere v. Bd. of Trs.*, 926 F.3d 356, 359 (7th Cir. 2019). That is, to avoid summary judgment, the nonmovant must show more than metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## ANALYSIS

Plaintiffs seek summary judgment on their claim for liquidated damages under ERISA, which imposes on employers "an affirmative obligation … to make contributions to multiemployer benefits plans in accordance with the terms" of agreements governing those plans. *RiverStone Grp., Inc. v. Midwest Operating Eng'rs Fringe Benefit Funds*, 33 F.4th 424, 430 (7th Cir. 2022). ERISA allows fiduciaries of benefit plans like Plaintiffs to sue employers to recover delinquent payments. 29 U.S.C. § 1132(g)(2). If delinquencies are found, the district court may award "the delinquent contributions, interest, attorneys fees, and amount equal to the greater of interest (again) or liquidated damages." *Cent. States, Se. & Sw. Areas Pension Fund v. Transp., Inc.,* 183 F.3d 623, 629 (7th Cir. 1999).

The Court finds Plaintiffs are entitled to summary judgment on the issue of liability for at least some of the claimed time periods, but not on the amount damages.

## I. Liability

To be entitled to summary judgment on the issue of liability, Plaintiffs must show that P.S. Coyote was contractually obligated to make timely contribution payments but failed to do so. *Martin v. Garman Const. Co.*, 945 F.2d 1000, 1004 (7th Cir. 1991) (ERISA obligation shown by "existence of a contractual relationship covered by the act, and whether a violation occurred"). As evidence of P.S. Coyote's obligation to make contribution payments, Plaintiffs submit the Memorandum Agreement and CBAs operative during the relevant time period of this suit. *See* Doc. 75-2 (Memorandum Agreement); 75-3 (CBAs).

P.S. Coyote's first argument is that the Memorandum Agreement and CBAs are improperly authenticated, inadmissible, or both. The Court disagrees. On a motion for summary judgment, "the court may consider any material that would be admissible or usable at trial, including properly authenticated and admissible documents or exhibits." *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000) (internal citation and quotations omitted). One way to authenticate a document for the purposes of summary judgment is to "attach an affidavit sworn to by a person who would be qualified to introduce the record as evidence at trial." *Id*. Authentication by affidavit is proper at the summary judgment stage even if those affidavits are not generally admissible at trial, *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997), so long as the affidavit was "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4).

Here, Plaintiffs authenticated the Memorandum Agreement and CBAs through the declaration of Christopher Anish, a representative of Local 130 who attests to his familiarity and knowledge of both operative and historic versions of Local 130's agreements. *See* Doc. 75-1 ¶¶ 1, 4. P.S. Coyote submits no facts or evidence challenging Mr. Anish's familiarity with or knowledge of Local 130's agreements, and so the Court rejects P.S. Coyote's authenticity argument.[2]

The Court also rejects P.S. Coyote's argument that the CBAs and Memorandum Agreement are inadmissible hearsay because "[s]tatements that constitute verbal acts … are not hearsay because they are not offered for their truth." *Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007). Verbal acts include statements that "affect[] the legal rights of the parties," like contracts. *Id.*; *see also* FED. R. EVID. 801(c) Advisory Committee Notes ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."). P.S. Coyote admits that its president signed the Memorandum Agreement on its behalf with Local 130. *See* Doc. 78 ¶ 2. Thus, the Court concludes the Memorandum Agreement is not hearsay but instead is a verbal act establishing P.S. Coyote's agreement to be legally bound by its terms. By extension, the CBA versions submitted in connection with Plaintiffs' summary judgment motion are not hearsay either because they are incorporated by reference into the signed Memorandum Agreement.

---

[2] To be clear, the facts that are contained within these documents appear to be undisputed: P.S. Coyote admits in its Rule 56.1 Response to Plaintiffs' proffered undisputed material facts that it signed the Memorandum Agreement and that this Agreement included language binding P.S. Coyote to the CBAs. Doc. 78 at ¶¶ 2–3. Similarly, P.S. Coyote admits that the CBAs contained language allowing the collection of liquidated damages of 8%. *Id.* ¶ 10.

Having determined it can properly consider the Memorandum Agreement and CBAs, the Court finds Plaintiffs have established P.S. Coyote's contractual obligation to make regular contribution payments to Plaintiffs and to pay liquidated damages in the event of late payments. And given P.S. Coyote's admission as to the delinquency of many monthly payments, *see* Doc. 78 ¶¶ 7, 11–81, the Court also finds no genuine dispute as to the issue of P.S. Coyote's liability to pay some amount of damages to Plaintiffs.

P.S. Coyote argues that despite its acknowledged late payments, the equitable doctrine of laches bars Plaintiffs' damages claims. Under Illinois law, laches is an "affirmative defense asserted against a party who has knowingly slept upon his rights and acquiesced for a great length of time." *Noland v. Mendoza*, 215 N.E.3d 130, 137 (Ill. 2022) (quotations omitted). The elements of laches are "lack of due diligence by the party asserting the claim" and "prejudice to the opposing party." *Id.*; *see also Teamsters & Employers Welfare Trust of Ill. v. Gorman Bros. Ready Mix*, 283 F.3d 877, 880 (7th Cir. 2002) (laches applies where plaintiff's suit was "delayed inexcusably and the defendant was harmed by the delay").

Plaintiffs argue P.S. Coyote may not assert laches because it did not raise it in its answer, and affirmative defenses not set forth in an answer to a complaint are generally deemed waived. *See* FED. R. CIV. P. 8(c); *Castro v. Chicago Housing Authority*, 360 F.3d 721, 735 (7th Cir. 2004). However, in its answer P.S. Coyote asserted that Plaintiffs are equitably estopped from pursuing liquidated damages in part due to their delay in bringing suit. *See* Doc. 10 at 7. While Plaintiffs argue that this falls short of asserting laches, the Seventh Circuit has explained in detail how "laches is … a form of equitable estoppel rather than a thing apart" *Gorman Bros.*, 283 F.3d at 882 (explaining the symmetry of the two doctrines). Thus, given P.S. Coyote's explicit

6

assertion of estoppel arising from Plaintiffs' delay in bringing suit, the Court finds P.S. Coyote's answer sufficiently raises the issue so as to not waive the defense.

Still, there is a significant difference between not waiving a defense and actually proving it. To that end, Plaintiffs note that P.S. Coyote never moved or cross-moved for summary judgment on their laches defense, despite the Court having twice set deadlines for dispositive motions. *See* Doc. 37, Doc. 73. Instead, P.S. Coyote only raised its laches defense in response to Plaintiffs' motion for summary judgment. Accordingly, Plaintiffs accuse P.S. Coyote of trying to improperly convert its opposition to Plaintiffs' summary judgment motion into a *de facto* cross-motion for summary judgment, in contravention of this Court's scheduling orders.

Procedurally, the Court is troubled by P.S. Coyote's decision to present its laches defense in an opposition brief. Typically, on a motion for summary judgment the Court construes all factual disputes and draws reasonable inferences in favor of the non-moving party. *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 895 (7th Cir. 2016). What, then, to make of the defendant who invokes an affirmative defense only in opposition to a plaintiff's summary judgment motion? Must the Court construe all reasonable inferences on the factual elements of that defense in defendant's favor, simply because they are the non-moving party? The Court thinks not. At summary judgment, defendants bear the burden of proving their affirmative defenses. *Zenith Elec. Corp. v. Panalpina, Inc.*, 68 F.3d 197, 201 (7th Cir. 1995). To construe inferences in a defendant's favor simply because the defense was raised in response to a plaintiff's summary judgment motion would create an end-run around that principle and improperly relieve the defendant of its burden.

But even were the Court to entertain P.S. Coyote's laches argument here and give it the benefit of reasonable inferences drawn in its favor, P.S. Coyote has not submitted evidence that

supports such a defense. Other than the timespan between Plaintiffs' earliest claimed damages and the filing of their complaint, P.S. Coyote's only factual evidence in support of laches arises from the declaration of John Salerno, one of P.S. Coyote's owners and executives. *See* Doc. 43-1. Specifically, Mr. Salerno averred in his declaration that P.S. Coyote lost all of its business records in a 2022 computer crash. *See* Doc. 43-1 ¶ 17. From this, P.S. Coyote argues that it has been prejudiced, and therefore laches applies, because P.S. Coyote "has no way of verifying Plaintiffs' claims and the amounts alleged." Doc. 77 at 8. For the reasons that follow, the Court is not persuaded.

As a preliminary matter, Mr. Salerno's statement that P.S. Coyote lost its business records due to a computer crash is substantively different from evidence that the records no longer exist anywhere. Nor is it a reasonable inference that the records no longer exist. It strains the bounds of credulity that P.S. Coyote did not have a payroll processing vendor or tax accountant who would have copies of the relevant records. And Mr. Salerno acknowledged that Plaintiffs audited P.S. Coyote in 2020 for the years going back to 2015, which means the auditor would have copies of the relevant records from 2015 to 2020. *See* Doc. 43-1 ¶ 11. Finally, as P.S. Coyote acknowledges, its records were sent on a monthly basis to Plaintiffs who thereafter sent monthly delinquency notices to P.S. Coyote based upon those records. Doc. 78 ¶¶ 7, 82. P.S. Coyote has not submitted any evidence that the delinquency notices were calculated incorrectly or were themselves destroyed. Thus, even accepting as true the fact that P.S. Coyote in 2022 lost its own business records (and excusing both P.S. Coyote's failure to bring a motion for summary judgment or even to submit this fact in a Rule 56.1 statement in opposition to summary judgment), no reasonable inference can be drawn that P.S. Coyote did not have the ability to obtain the records from other sources. Thus, P.S. Coyote has not demonstrated prejudice arising

from its computer crash. *See*, *e.g.*, *Van Milligan v. Board of Fire and Police Com'rs of Village of Glenview*, 630 N.E.2d 830, 834 (Ill. 1994) (collecting cases finding laches inapplicable where delay in bringing suit did not prevent a fair trial).

Nor is there any other evidence to support a laches defense. Under Local 130's CBAs, P.S. Coyote agreed to maintain ten years of payroll records. *See* Doc. 75-3 at 37, 143 (for reporting and compliance auditing purposes, "[t]he Employer shall retain payroll records … for a period of ten (10) years."). It is not Plaintiffs' fault that P.S. Coyote did not adhere to this contract term. And unlike in many laches cases where the plaintiff misleads the defendant or somehow creates an impression that they would not be pursuing the debt owed, Plaintiffs in this case sent repeated delinquency notifications. *See DeBruyn v. Elrod*, 418 N.E.2d 413, 417 (Ill. 1981) ("Laches is not simply a matter of delay … to bar the action it must appear that a plaintiff's unreasonable delay in asserting his rights has prejudiced and misled the defendant, or caused him to pursue a course different from what he would have otherwise taken.") (internal quotations omitted). Given all of this, P.S. Coyote has not demonstrated a genuine dispute of fact that would support a laches defense, and Plaintiffs are entitled to summary judgment on issue of liability for their ERISA claim.

## II. Damages

Plaintiffs contend they are also entitled to summary judgment on the amount of damages, which they calculate at $107,729.89. P.S. Coyote argues summary judgment is not appropriate because (1) as a threshold matter, Plaintiffs derive their damages value from evidence that is neither authenticated nor admissible; (2) even on that evidence, Plaintiffs calculated damages improperly; and (3) Plaintiffs improperly seek damages for harms falling outside the scope of their complaint.

9

The Court starts with P.S. Coyote's authenticity and admissibility arguments. Plaintiffs explain that they calculated damages using data drawn from monthly reports that P.S. Coyote submitted to Plaintiffs on a regular basis. Data from these monthly reports appear in the summary judgment record in two forms. For monthly reports from January 2020 onward, Plaintiffs supplied copies of remittance receipts corresponding to the reports. *See* Doc. 75-1 ¶ 20; Doc. 75-6. For contribution months before January 2020, Plaintiffs supply summary data inputted by Plaintiffs' staff based on P.S Coyote's late-paid contribution reports. *See* Doc. 75-1 ¶ 19; Doc. 75-5.

Regarding the earlier summary data, P.S. Coyote argues that Mr. Anish lacks the personal knowledge to establish its authenticity. Authenticating affidavits must be made on personal knowledge, *see* FED. R. CIV. P. 56(c)(4), and so the Court must determine whether Mr. Anish's declaration convinces the Court of his ability to introduce the evidence at trial. Here, Mr. Anish describes P.S. Coyote's practice of submitting contribution reports to Plaintiffs and Plaintiffs' practice of making internal records based on those reports. Doc. 75-1 ¶¶ 13–14. Mr. Anish further attests that "[he] and his staff take the recording of this information very seriously." *Id*. ¶ 15.

While Plaintiffs could have offered more detail about Mr. Anish's role and involvement in this process, the Court is unpersuaded by P.S. Coyote's argument that Mr. Anish lacks competency to authenticate Plaintiffs' internal records. The party challenging the authenticity of evidence "bears the burden of showing that a genuine issue of authenticity exists." *Tyson v. Jones & Laughlin Steel Corp.*, 958 F.2d 756, 761 (7th Cir.1992). As the Court sees it, P.S. Coyote had ample opportunity during discovery to investigate Plaintiffs' records for factual inaccuracies or test Mr. Anish's knowledge of the data at issue. Having presented no facts or

10

evidence to undermine Mr. Anish's credibility, the Court finds P.S. Coyote has not carried its burden of establishing an authenticity issue as to Plaintiffs' summary data of P.S. Coyote's monthly reports before January 2020.

The Court also rejects P.S. Coyote's argument that the monthly reports are inadmissible hearsay. First, in its response to Plaintiffs' Rule 56.1 statement, P.S. Coyote admits that it submitted the contribution reports, *see* Doc. 78 ¶ 7, and does not raise a serious question about Plaintiffs having then recorded that data in their own records. *Id*. ¶ 8. Thus, P.S. Coyote admits that its monthly submissions are its own admissions, and statements of a party opponents are not hearsay. *See* FED. R. EVID. 801(d)(2). Second, to the extent there may have been additional data apart from that provided by P.S. Coyote, the records maintained by Plaintiffs are business records.[3] While Plaintiffs' Rule 56.1 statement presented P.S. Coyote the opportunity to specifically challenge any late payment report relied on by Plaintiffs to calculate damages, P.S. Coyote declined to do so, instead admitting lateness and objecting only to Plaintiffs' method of calculation. *See* Doc. 78 ¶¶ 11–81. Given this record and absent any further development or argument from P.S. Coyote about these monthly reports, the Court finds P.S. Coyote's hearsay challenge unavailing.

---

[3] Mr. Anish's declaration establishes that Federal Rule of Evidence 803(6)'s requirements are met because he states that he and his staff made the records after receiving P.S. Coyote's reports as part of their normal business practice. Doc. 75-1 at 2-3. P.S. Coyote's only objection to Plaintiffs' description of their recordkeeping practices is that P.S. Coyote "has insufficient information as to the Funds' normal course of business." Doc. 78 ¶ 8. That's not a denial. Under the Local Rules, contesting a movant's statement of facts requires the nonmovant to cite "specific evidentiary material that controverts the fact and … concisely explain how the cited material controverts the asserted fact." L.R. 56.1(e). "[M]ere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

Threshold issues disposed of, the Court turns to P.S. Coyote's challenge to the accuracy (and intelligibility) of Plaintiffs' damages calculations. As previously discussed, each of P.S. Coyote's monthly reports noted the total amount P.S. Coyote did not pay for that month. Plaintiffs seem to have derived damages by taking eight percent of the total delinquency as stated the monthly reports and summing up the values for all delinquent months. So, for example, P.S. Coyote's contribution report for January 2020 shows it failed to timely make its required total contribution of $13,823.66. *See* Doc. 75-6 at 2. Plaintiffs therefore determined $1,105.89 , which is eight percent of $13,823.66, as the liquidated damages P.S. Coyote owed for that month. *See* Doc. 75 ¶ 49; *see also* Doc. 79 at 7 (describing calculation method).

P.S. Coyote contends this calculation method is improper because at most Plaintiffs are only authorized to impose liquidated damages on a portion of each month's total, not their entirety. Specifically, P.S. Coyote points out that the total delinquency in each monthly report is the sum of P.S. Coyote's payment obligations to various distinct funds, all of which are denoted in each report with separate line items and corresponding coding acronyms. *See*, *e.g.*, Doc. 75-6 at 2. According to P.S. Coyote, only some of these funds are permitted to charge liquidated damages in the event of late payment, a limitation P.S. Coyote draws from its reading of the following paragraph of Local 130's most recent CBA:

> The provisions for … liquidated damages … available to the Union and/or Trustees of the various Funds in the event of an Employer's breach of any obligation under this Section 9.8 and Sections 9.1, 9.2, 9.3, 9.4, 9.7, and 9.9 of this Article IX, and Sections 6.4, 6.5, 6.6 of Article VI are cumulative and … shall not serve as substitute or in any way limit any other remedies or relief which also may be available to the Union and/or the Trustees …

Doc. 75-3 at 36.[4] If a fund is not mentioned in one of the enumerated sections, P.S. Coyote argues, they may not seek liquidated damages. Thus, given this contractual limitation and Plaintiffs' failure to provide evidence identifying the funds listed in each monthly report, P.S. Coyote asserts that Plaintiffs have failed to demonstrate beyond dispute the factual correctness of their damages calculations.

Plaintiffs dispute this characterization. Regarding Section 9.8 of the CBAs, Plaintiffs point out that the liquidated damages provision expressly covers "all contributions and deductions provided for in this Agreement," not just a subset, and further states that the amount shall be 8% "on the cumulative outstanding balance due." *See* Doc. 75-3 at 35, 87, 141. Thus, the liquidated damages penalty may be imposed on all overdue payments, not just payments to the specific funds appearing in the enumerated sections. Plaintiffs also offer in their reply brief an explanation of what each acronym listed in the monthly reports means, with the assurance that each line corresponds to a payment obligation arising somewhere in the CBAs. The "DUE" line, for instance, corresponds to dues deductions owed to Local 130, while some of the other lines correspond to contributions owing to various Local 130-affiliated funds, such as the PCA Industry Fund, Political Action Committee Fund, Target Fund, and Building Fund. *See* Doc. 79 at 7; *see also* Doc. 75-6 at 2.

On the meaning of Section 9.8 of the CBAs, the Court agrees with Plaintiffs' reading and does not interpret the CBAs to limit recovery for liquidated damages to only a subset of Local 130-affiliated funds. That said, the Court is concerned that Plaintiffs waited until their reply brief to explain how to read the monthly reports, after having submitted an opening brief in support of

---

[4] While not identical, for present purposes earlier versions of the CBA contain materially equivalent language. *See id.* at 88, 142.

their motion for summary judgment of only three pages. *See* Doc. 76. To grant summary judgment against P.S. Coyote based on material evidence newly presented in Plaintiffs' reply brief would be an abuse of discretion by this Court, as doing so deprives the nonmovant of fair chance and opportunity to respond to that evidence. *See Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 950 F.3d 959, 968 (7th Cir. 2020).[5] There is also the problem that Plaintiffs' explanation is not totally credible. For instance, they explain that "Retiree Medical contributions" are provided for in Appendix C to the CBAs. Doc. 79 at 7. But on its own review, the Court has found nothing in that document which obviously corresponds to such a contribution. *See*, *e.g.*, Doc. 75-3 at 50 (Appendix C to Local 130's most recent CBA).

But even had Plaintiffs had thoroughly explained their calculation methodology and the meaning of line items in the monthly reports, there is still another obstacle to summary judgment. Accepting that P.S. Coyote owes damages on the entire delinquency sum identified in each monthly report, Plaintiffs must also establish that *they* are the proper legal entities to collect those damages. As Plaintiffs themselves explain, P.S. Coyote's monthly reports describe late payments to entities such as Local 130, PCA Industry Fund, Political Action Committee Fund, Target Fund, and Building Fund, among others. *See* Doc. 79 at 7. But neither Local 130 or these other funds are parties to this action, and Plaintiffs offer no factual or legal basis for why they would be entitled to damages based on P.S. Coyote's late payments to other entities, or alternatively, to collect those damages on those entities' behalf.[6] For this reason, the Court

---

[5] Further compounding this issue is that while Plaintiffs explain how to interpret the coding acronyms used in monthly reports from January 2020 onward, a different set of acronyms seems to have been in use for the reports from August 2015 until November 2019.

[6] To be sure, there may be sensible reasons why these other entities are not parties to the present suit. Perhaps Local 130 and other non-party funds assigned Plaintiffs the right to collect damages arising from late-paid dues and contributions on their behalf. Or perhaps the other named funds are not standalone

cannot grant summary judgment to Plaintiffs on the amount of damages, given Plaintiffs' failure to establish beyond genuine dispute that their method of calculation accurately reflects what P.S. Coyote actually owes them.

While the Court's conclusion regarding Plaintiffs' calculation of damages forecloses summary judgment in their favor, the Court will briefly address P.S. Coyote's argument that Plaintiffs also improperly seek recovery for injuries falling outside the scope of their current complaint. P.S. Coyote argues that while Plaintiffs now seek damages based on late payments occurring between August 2015 and June 2024, Plaintiffs' complaint limits their damages claim to those arising from late payments through August 2022. *See* Doc. 1 at 4–5. Plaintiffs argue in response that courts routinely award damages that accrue during an action's pendency, and that in any event, it would be in the interests of justice to allow Plaintiffs to amend their complaint.

While the Court would open to considering a tailored amendment, the well-established rule is that plaintiffs cannot amend their complaint via their summary judgment briefing. *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 488 (7th Cir. 2011). Accordingly, Plaintiffs may not at this time seek damages arising from P.S. Coyote's late payments post-August 2022, as those injuries fall outside of the allegations in the current operative complaint.

---

legal entities at all, and instead are merely accounts managed entirely by one of the Plaintiffs. But this is speculation only, and to grant summary judgment, the Court needs more than 'perhaps.' The CBAs do not specify who liquidated damages are payable to, stating only that they are available "to the Union and/or Trustees of the various funds." *See, e.g.*, Doc. 75-3 at 36.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is granted in part and denied in part. On the issue of P.S. Coyote's liability under ERISA to pay liquidated damages on late payments accruing between August 2015 and August 2022, the Court grants Plaintiffs' motion. On the issue of damages and P.S. Coyote's liability for late payments occurring after August 2022, Plaintiffs' motion is denied.

Dated: January 13, 2026

_____
APRIL M. PERRY
United States District Judge